**LURIA BROTHERS & COMPANY, INC., a corporation,**

v.

**Thomas R. ALLEN, Jr. and Morton J. Greene, trading as Economy Industrial Properties, a partnership, Appellants.**

**No. 81–1685.**

United States Court of Appeals, Third Circuit.

Argued Jan. 22, 1982.

Decided March 15, 1982.

Opinion on Denial of Rehearing May 13, 1982.

---

Edward C. Leckey (argued), Pittsburgh, Pa., for appellants.

C. Richter Taylor, Jr. (argued), P. Jerome Richey, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for appellee.

Before SEITZ, Chief Judge, and ALDISERT and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

Two major federal questions are presented in this appeal from the judgment of a district court in a diversity case: (1) under the teachings of *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), and *Parks v. "Mr. Ford"*, 556 F.2d 132 (3d Cir. 1977) (in banc), does a private landlord's posting of a notice of distraint under the Pennsylvania Landlord and Tenant Act constitute state action? and (2) may the losing party in an action brought under 42 U.S.C. § 1983 recover attorney's fees under 42 U.S.C. § 1988 if it prevails on a related state claim? A landlord appeals from a judgment entered on a jury verdict awarding compensatory and punitive damages, and the district court's subsequent award of attorney's fees, to a former subtenant who brought an action to recover possession of personal property and damages for the landlord's refusal to release that property. The plaintiff succeeded under the theories that defendants violated both federal constitutional law and the distraint provisions of the Pennsylvania Landlord and Tenant Act of 1951. We reverse as to the constitutional claim, affirm the judgment on the state claim, and reverse the award of attorney's fees.

### I.

Economy Industrial Properties, a partnership of appellants Thomas R. Allen, Jr. and Morton J. Greene, owned two parcels of industrial property in Ambridge, Pennsylvania. On June 13, 1975, Economy leased the parcels to Bollinger Corporation for a term of 10 years. At the time of the lease Allen was president of Bollinger and a member of its board of directors; Greene was chairman of the board of directors. Allen and his wife owned three per cent of the stock in Bollinger; Greene owned no Bollinger stock, but he was trustee of a pension trust owning 31% of Bollinger's shares and he was custodian of another 23% of the stock on behalf of his children. On July 7, 1975, Bollinger sublet a portion of this property to Luria Brothers & Co., an Ohio-based scrap metal company having no corporate ties to either Economy or Bollinger.[1] Luria used the subleased premises as a warehouse and fabricating plant.

On March 31, 1976, Bollinger filed a petition for an arrangement under Chapter XI of the Bankruptcy Act, and on the same day Carl L. Bigler was appointed receiver. Bollinger continued operations in the portion of the leased premises not sublet to Luria. The receiver initially continued the employment of Greene and Allen, but released both of them by mid-October 1976. Thus, the two principals of the landlord actively participated in the business of the tenant both before and after the tenant went into receivership. In late October 1976, the receiver terminated Bollinger's operations at the leased premises, and by November 5, 1976, he had removed Bollinger's inventory and equipment.

There is no suggestion that Luria failed to pay rent to Bollinger under the sublease; indeed, it paid the entire amount in advance. Bollinger was delinquent in its rent payments to Economy, however, and after the Chapter XI petition was filed, the receiver also failed to submit to Economy the full amount of the use and occupancy rent

---

1. Actually, Bollinger subleased the property to Luria's parent corporation, Ogden Metals, Inc., a distinction without a difference in this appeal.

he was required to pay for the months of April through October, 1976. On November 16, 1976, the receiver and his counsel, Robert Sable, met with Greene and Allen to discuss certain unresolved matters incident to the cessation of operations on the leased premises, including the payment of use and occupancy rent. In a letter dated November 23, 1976, Sable summarized what he believed the parties had agreed upon at the meeting. According to this letter, drafted for the signatures of the receiver, Allen, and Greene, the receiver was to pay use and occupancy rent of $7,945.70 for the period through October 31, 1976, and $500.00 for the period from November 1 through November 5, 1976.

Greene responded on November 26, enclosing a revised draft of Sable's letter. Among the changes which appeared in this draft was a reference to November 5, 1976, as the "date Receiver surrendered the premises to Economy." App. at 889. Allen also responded and in his suggested changes, he too noted: "Receiver will formally terminate [and] abandon lease on Nov. 5." App. at 892.[2]

On December 6, 1976, pursuant to the Pennsylvania Landlord and Tenant Act, Allen posted a notice of distraint, signed "Economy Industrial Properties By Thomas R. Allen, Jr., Partner," on the office door of the subleased premises. Economy claimed that as of that date there was $293,145.70 rent due.[3] At the time of distraint, Luria had stored approximately 300 tons of steel plate on the premises; Greene padlocked the gates, preventing Luria from removing it. When Economy refused to allow Luria to remove the steel plate from the premises, Luria was forced to post a $90,000 bond to

release it. Luria subsequently sued Economy on two theories: (1) that Economy's use of the distraint procedure offended the due process clause of the fourteenth amendment and therefore gave rise to a claim under 42 U.S.C. § 1983, and (2) that it violated Pennsylvania law because the distraint had occurred at a time when the lease between Economy and Bollinger was no longer in effect. Economy counterclaimed for a decree that the distraint was proper and that the steel plate properly belonged to it.

Trial in the district court was bifurcated: Economy was found liable in a non-jury trial, see Luria Brothers & Co. v. Allen, 452 F.Supp. 732 (W.D.Pa.1978), and a jury subsequently fixed the amount of damages. In the verdict, Luria was awarded compensatory damages of $26,858.52, and punitive damages of $15,000 on the § 1983 claim and $15,000 on the state claim.[4] The court subsequently awarded Luria $52,660 attorney's fees pursuant to 42 U.S.C. § 1988. 512 F.Supp. 596. The district court rejected Economy's counterclaim and denied its motions for judgment n.o.v. and new trial.

On appeal, Economy argues that the § 1983 claim must fail because there was no state action; that the lease between Economy and Bollinger was still intact on the day of the distraint, and therefore that the procedure conformed to state law; and that because the federal action under § 1983 falls, the right to attorney's fees under § 1988 falls with it.

## II.

In attacking the § 1983 judgment, Economy relies on *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185

---

2. The letter and the proposed changes were never reduced to one final document because of disagreement over the amount that Greene should be reimbursed for his expenses.

3. This amount represented $9,600.00 rent which had accrued prior to the receivership, the $7,945.70 that was to cover the April-October portion of the receivership period, $2,600 each for November and December 1976, and $270,400 accelerated rent for the balance of the term of the lease.

4. Although the jury awarded separate sums of $15,000 for punitive damages on both the § 1983 and the state law claim, the district court's order provides for only one $15,000 award for punitive damages and does not specify whether they were awarded on the basis of the federal or state law claim. The district court's subsequent discussion of the jury's action reflects an understanding that the award would have been justified on either basis. Mem. op., reprinted in app. at 829–30 & n.10.

(1978), and *Parks v. "Mr. Ford"*, 556 F.2d 132 (3d Cir. 1977) (in banc), for its argument that no state action was present in the distraint.[5] It argues that no public official was involved in the distraint and that the conduct complained of is not the exclusive prerogative of the state.

Luria responds that state action existed by virtue of the distraint procedure under which Economy seized Luria's steel plate, and further that "[b]y resorting to the courts [in their counterclaim] and asking the courts to ratify their seizure of Luria's goods and to decree that Defendants were the rightful owner of these goods, ... the Defendants significantly involved the state in their conduct." Brief for Appellee at 9. Luria also contends that the statute delegates to private persons a power traditionally reserved to the state. In Luria's view, in acting under the distraint statute Economy did something that only the state can do: it seized property in which it had no interest and which was unrelated to any debt owing. Moreover, *Flagg Bros.* is distinguishable, Luria argues, because a debtor-creditor relationship existed in *Flagg Bros.* whereas Luria and Economy had no such relationship.

The district court in this case found a constitutional violation in Economy's resort to the distraint provisions of Article III of the Pennsylvania Landlord and Tenant Act

of 1951,[6] which had been declared unconstitutional in *Ragin v. Schwartz*, 393 F.Supp. 152 (W.D.Pa.1975) (three-judge court).[7] It found state action by interpreting the teachings of *Parks*, discerning therein a distinction between rights conferred by statute and rights conferred by common law. The district court relied on the following passage from the plurality opinion in *Parks*:

> In contrast to our view that state action is not present when a vehicle is retained under the common law lien, we believe that state action is present when a garageman sells a customer's vehicle under the statutory scheme just described. First, the garageman's power to sell property retained under his common law lien, unlike the lien itself, was not authorized prior to the enactment of the statute in 1925 and arises *solely* from that legislation. *Parks*, supra at 141. (emphasis added)

452 F.Supp. at 737. The district court interpreted *Parks* to mean that state action is not present where the defendant's claim of right is based on statutory codification of common law, and concluded that, by contrast, Economy's distraint rights arose solely from the Landlord and Tenant Act.

As we noted in *Magill v. Avonworth Baseball Conference*, 516 F.2d 1328, 1331 (3d Cir. 1975), the Supreme Court has "pierced the seemingly impenetrable veil of private, individual conduct to find state ac-

---

5. Section 1983 provides in relevant part:

   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

6. Pa.Stat.Ann. tit. 68, §§ 250.301—.313. Section 250.302 sets forth a description of the landlord's power to distrain personal property located on the premises occupied by a tenant; §§ 250.308 and .309 outline the procedures for sale, by public officials, of distrained property.

7. In *Ragin*, the court held that a constable's act of posting a distraint notice which threatened a sale of the distrained goods was an action "un-

der color of law" as required by § 1983. Because a state official was involved in the actions found unconstitutional in *Ragin*, those actions are not analogous to the conduct, at issue here. Moreover, *Ragin* was decided prior to *Parks* and *Flagg Bros.* Subsequently, the aspects of the distraint statute at issue in this case were analyzed in light of *Parks* and *Flagg Bros.* in *SMI Industries, Inc. v. Lanard & Axilbund, Inc.*, 481 F.Supp. 459 (E.D.Pa.1979). The court in *SMI* emphasized the distinction between the private posting of a notice of distraint and the seizure of goods by a public official. Following *Parks* and *Magill v. Avonworth Baseball Conference*, 516 F.2d 1328 (3d Cir. 1975), Judge Ditter held that the settlement of disputes between a commercial landlord and tenant has not been an exclusive state function, and that state action is not presented by the mere posting of a distraint notice by a private person. 481 F.Supp. at 462–63.

tion."[8] *Flagg Bros.*, decided after the district court's liability phase opinion was written, provides guidance that we may apply to the question of state action in this § 1983 case. Luria must show both that it has been deprived of a right "secured by the Constitution and the laws" of the United States and that Economy deprived it of this right acting "under color of any statute" of the Commonwealth of Pennsylvania. "It is clear that these two elements denote two separate areas of inquiry." 436 U.S. at 155–56, 98 S.Ct. at 1732–33 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970)). As we observed in *Magill*, 516 F.2d at 1331–32, some rights established either by the Constitution or by other federal law are protected from both governmental and private deprivation. Although most rights secured by the Constitution are protected only against infringement by governments, a private person may cause such a deprivation and be held liable under § 1983, but only when he does so under color of state law. *See Flagg Bros.*, 436 U.S. at 156, 98 S.Ct. at 1733. Thus, in this case Luria had the burden of establishing that Economy's actions are properly attributable to the Commonwealth of Pennsylvania.

This court in *Parks* was called upon to determine if a private person's actions pursuant to state law constituted state action. The question presented was the constitutionality of both a Pennsylvania common law rule giving an automobile repairman a possessory lien for payment on vehicles he repairs, and a statute that permits him to sell those vehicles to satisfy the lien. A plurality of the court in banc held that the *assertion* of the lien was not state action, 556 F.2d at 134–40, but the full court held that the *sale* to satisfy the lien did constitute state action because the statute delegated to the garageman powers traditionally reserved to state officials, *id.* at 141.

Subsequent to our decision in *Parks*, the Supreme Court in *Flagg Bros.* held that a warehouseman's proposed sale under the Uniform Commercial Code of goods entrusted to him for storage was not state action because the statute did not delegate a traditional state power to a private individual. The Court held that settlement of creditor-debtor disputes was not traditionally an exclusive state function, 436 U.S. at 161–64, 98 S.Ct. at 1736–37; that a distinction between common law remedies and statutory authorization would not be dispositive, *id.* at 162–63, 98 S.Ct. at 1736–37; and that a state's acquiescence in a private action, *i.e.*, its decision not to intervene if a creditor follows mandated procedures, is not state action, *id.* at 164–66, 98 S.Ct. at 1737–38.

The district court erred in its interpretation of our decision in *Parks*. The important distinction drawn in *Parks* was not between common law and statutory rights,[9] but between the act of *asserting a lien* —which the plurality did not regard as state action—and the act of *selling*—which the court unanimously held did implicate state action.[10] The district court's holding

8. In *Magill* we explained:
   These cases have the capability of being grouped into three general categories: (1) where state courts enforced an agreement affecting private parties [*see, e.g., Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948)]; (2) where the state "significantly" involved itself with the private party [*see, e.g., Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)]; and (3) where there was private performance of a government function [*see, e.g., Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953)].
   516 F.2d at 1331.

9. The *Flagg Bros.* Court stated that the distinction between common law and statutory rights

and remedies was not controlling: "To rely upon the historical antecedents of a particular practice would result in the constitutional condemnation in one State of a remedy found perfectly permissible in another." 436 U.S. at 162–63, 98 S.Ct. at 1736–37.

10. With regard to sales subsequent to assertion of a lien, we stated:
    By thus authorizing sales to take place, directing how they are to be carried out, and giving them the effect of judicial sales, Pennsylvania has quite literally delegated to private individuals, powers "traditionally exclusively reserved" to sheriffs and constables. In our view, that grant of power has the same effect for state action purposes as if Pennsylvania had endowed private individu-

that state action was present in the distraint is also erroneous in light of *Flagg Bros.* As in *Flagg Bros.*, the plaintiff has named no public officials as defendants in its complaint. *See* 436 U.S. at 157, 98 S.Ct. at 1734. The total absence of overt official involvement clearly distinguishes this case from several Supreme Court decisions imposing restrictions on creditors' remedies.[11] "While as a factual matter any person with sufficient physical power may deprive a person of his property, only a State or a private person whose action 'may be fairly treated as that of the State itself,' [*Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974)] may deprive him of 'an interest encompassed within the Fourteenth Amendment's protection.' [*Fuentes v. Shevin*, 407 U.S. 67, 84, 92 S.Ct. 1983, 1996, 32 L.Ed.2d 556 (1972)]." *Flagg Bros.*, 436 U.S. at 157, 98 S.Ct. at 1734.[12] We now must decide whether, in the absence of overt official involvement, Economy's action nevertheless "may be fairly treated" as that of the Commonwealth of Pennsylvania.

The Commonwealth's authorization of procedures for obtaining relief does not of itself convert into a state actor one who avails himself of those procedures. To paraphrase *Flagg Bros.*, this system of rights and remedies, recognizing the traditional place of private arrangements in ordering relationships in a commercial world, can hardly be said to have delegated to Economy an exclusive prerogative of the sovereign. 436 U.S. at 160, 98 S.Ct. at 1735.[13] As in *Flagg Bros.*, the statute at issue permits but does not compel creditor self-help. *See* 436 U.S. at 165–66, 98 S.Ct. at 1738–39.

We reject the suggestion that *Flagg Bros.* is inapplicable here because there was no debtor-creditor relationship between Economy and Luria. We fail to see how this variation from the fact pattern in *Flagg Bros.* would require us to find state action present: it does nothing to change the fact that no official was involved and that no exclusive state function was delegated to Economy. Luria fails to understand the significance of the Court's recognition of commercial self-help remedies. Under the law of Pennsylvania, subtenants' goods situated on leased premises serve as a type of security to the lessor, giving the

als with the same authority to arrest suspects and to execute warrants as state and local police possess. *Cf. Griffin v. Maryland*, 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964). As a result, we have no doubt that state action exists when a garageman sells a customer's vehicle pursuant to Pa.Stat.Ann. tit. 6, §§ 11–14.
556 F.2d at 141. Under the facts of this case we are not required to decide whether the above quoted holding in *Parks* survives the Supreme Court's subsequent decision in *Flagg Bros.*

11. *See, e.g., North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).

12. Recently in *Chrysler Corp. v. Fedders Corp.*, 670 F.2d 1316 (3d Cir. 1982), a panel of this court considered whether the filing of a notice under New Jersey's lis pendens statute constituted state action. Although the issue could not be resolved because of the three differing approaches taken by the judges on that panel, in her opinion announcing the judgment of the court, Judge Sloviter observed that state action, in light of *Flagg Bros.*, turns on the involvement of state officials. *Id.* at 1325. Concurring in the judgment, Judge Hunter noted that he did not believe the appellees were deprived of a constitutionally protected right, and further, he would find no state action. He stated that because the state official's conduct at issue was purely ministerial, it did not "transform an essentially private transaction into a state action." *Id.* at 1338. Judge Adams' concurrence in the judgment did not reach the state action issue. Even if the filing of a lis pendens notice does constitute state action, it is not analogous to the procedures at issue in this case which do not involve even mere ministerial acts of state officials.

13. The distraint was not the only means provided by the state to resolve the financial dispute between Economy and Bollinger; lessors and lessees have the ability to proceed to vindicate private rights in a variety of ways, including ejectment, Pa.Stat.Ann. tit. 68, § 250.511; Pa.R.Civ.P. 1051–1058, 3160–3165; assumpsit, Pa.Stat.Ann. tit. 68, § 250.301, Pa.R.Civ.P. 1001–1039; replevin, Pa.Stat.Ann. tit. 68, § 250.306; Pa.R.Civ.P. 1071–1087, 3170–3173; and confession of judgment, Pa.Stat.Ann. tit. 68, § 250.511; Pa.R.Civ.P. 2950–2974.

lessor a means to satisfy a debt owed it by its debtor, the tenant and sublessor. Subtenants fearing a landlord-tenant squeeze play may secure a landlord's waiver. Luria has not alleged that state law barred it from obtaining from the primary lessor a no-distraint clause in Luria's sublease with Bollinger.

At bottom, there was the same absence of state action in Greene's posting of the distraint as there was in *Flagg Bros.* in the assertion of the warehouseman's lien: the state simply was not involved in the process. The Commonwealth of Pennsylvania was in no way responsible for Economy's decision to have a private person, Greene, post the premises. *Cf. Ragin v. Schwartz,* 393 F.Supp. 152 (W.D.Pa.1975) (three-judge court) (posting by constable). Pennsylvania law permitted but did not compel Economy's withholding of Luria's steel plate; in enacting the distraint procedures, the state only announced the circumstances under which a private individual may act.[14] Finally, we reject Luria's argument that the district court adjudication of Economy's counterclaim converted an otherwise private matter into state action. *Flagg Bros.* teaches:

> If the mere denial [or grant] of judicial relief is considered sufficient encouragement to make the State responsible for those private acts, all private deprivations of property would be converted into public acts whenever the State, for whatever reason, denies [or grants] relief sought by the putative property owner.

436 U.S. at 165, 98 S.Ct. at 1738.

■ We hold that when a private person merely takes advantage of a self-help remedy recognized by the state, his actions are not attributable to the state. We therefore conclude that no state action was

presented by Economy's posting of the notice of distraint or by its counterclaiming in the district court. Accordingly, we reverse the judgment of liability under 42 U.S.C. § 1983.

### III.

We now turn to the state claim set forth in Count II of Luria's complaint. Under the Pennsylvania Landlord and Tenant Act, after the primary lease has terminated, a subtenant's goods are not subject to distress for his sublessor's arrears of rent due to the lessor. The statute provides in relevant part:

> A landlord ... may ... distrain personal property located on the premises but only that belonging to the *tenant,* for arrears of rent due *on any lease which has ended and terminated,* if such distress is made during the continuance of the landlord's title or interest in the property.

Pa.Stat.Ann. tit. 68, § 250.302 (emphasis supplied). Under Luria's theory, the lease having been surrendered, Economy's right of distraint as a landlord was limited to the property of its tenant, Bollinger; that right did not extend to distraint on property of Luria, the subtenant.

Economy does not challenge Luria's choice of this controlling legal precept; rather, it challenges the precept's application to the facts in this case, asserting three discrete reasons why the tenant and sublessor had not surrendered the lease:

> First, the Receiver could not surrender the leasehold without the approval of the Bankruptcy Court. Second, there is absolutely no evidence of any agreement on the part of the Receiver for Bollinger to surrender the leasehold.... [Third,] even if there were any such evidence, such an agreement would have been un-

---

14. The district court's decision on liability, 452 F.Supp. 732 (W.D.Pa.1978), was announced prior to the Supreme Court's *Flagg Bros.* decision. In a subsequent memorandum opinion, however, the district court elaborated on its liability holdings in light of *Flagg Bros.* Characterizing its earlier *Parks*-based analysis as an alternative ground, the district court held that its § 1983 liability decision was still valid in

light of *Flagg Bros.* because the Pennsylvania distraint statute inevitably compelled the involvement of state officials. Mem. op., reprinted in app. at 826–29. We disagree. As the facts of this case demonstrate, one who posts a notice of distraint need not involve state officials if he is content with posting the property and does not proceed to sale.

enforceable under the law of the Commonwealth of Pennsylvania.

Brief for Appellants at 24. The first reason presents a mixed question of fact and law. The second reason involves questions of fact found by the trial court; on review we are governed by the "clearly erroneous" rule. Fed.R.Civ.P. 52(a). The third reason presents a question of law; in this court our review is plenary.

## A.

Economy argues that Bigler, the receiver for Bollinger, had no authority to reject or surrender the Bollinger-Economy lease without approval of the bankruptcy court. This argument not only involves sophisticated analyses of the nuances of bankruptcy law; it also required factual development before a fact finder to establish the extent of the powers and duties granted to the receiver in this case. Economy did not choose to do this at trial. A review of the opinions of the court below and the documents and appendix submitted to this court reveals that the necessary factual development did not take place because the argument Economy now advances was not presented to the district court.[15]

In *Newark Morning Ledger Co. v. United States*, 539 F.2d 929, 932 (3d Cir. 1976), Justice Clark, writing for this court, stated our position that, absent the prospect of a gross miscarriage of justice, we will not consider arguments raised for the first time on appeal. *See also Franki Foundation Co. v. Alger-Rau & Associates*, 513 F.2d 581, 586 (3d Cir. 1975) ("[T]his rule is only a rule of practice and may be relaxed whenever the public interest or justice so requires."). Behind our disinclination to hear a newly raised theory is our belief that the district court should be allowed to consider the arguments, preside over the factual development, and thus create a complete record on appeal. *See* 539 F.2d at 933; *accord, Toyota Industrial Trucks U.S.A., Inc. v. Citizens National Bank*, 611 F.2d 465, 470 (3d Cir. 1979).

Counsel for Economy asserted at oral argument that he had raised this issue in the court below, but our examination of the appendix submitted in this case discloses only general discussions of the actions taken by the receiver pursuant to his appointment and reveals no assertion that under bankruptcy law the receiver was without power to surrender the lease. The issue was not presented in the pleadings or reflected in testimony prior to the district court's order in the liability phase of the adjudication; moreover, Economy did not assert this contention in its subsequent motions, where it might have been brought to the attention of the district court. It was Economy's responsibility to present this issue on the trial court level. Failing that, it cannot belatedly be heard on it on an appellate level. Our recognition of the division of competencies between trial and appellate courts compels us to forego consideration of a theory on which the trial court was not given a meaningful opportunity to develop a factual record.

## B.

We now turn to the evidence presented before the district court to determine whether its finding of a surrender of the lease was clearly erroneous. We measure its findings against the standard established in *Krasnov v. Dinan*, 465 F.2d 1298, 1302–03 (3d Cir. 1972).

In the autumn of 1976, the receiver decided to terminate Bollinger's operations at the leased premises and to remove Bollinger's property. By November 5, 1976, he had done so. On November 16, 1976, he and Robert Sable, his attorney, met with Allen and Greene to resolve various controversies that had arisen during the receivership.

On November 23, 1976, Sable drafted a letter to memorialize the various agreements that had been reached at the November 16th meeting. With respect to rent, Sable wrote as follows:

2. The receiver will pay to Economy the sum of $7,945.70 for the base rental of the property occupied by Bollinger for the period through October 31, 1976.

. . . .

4. The receiver will pay the sum of $500 for use and occupancy for the Econo-

15. We note that the parties included the following question of law in their pretrial stipulations:

What is the status of the Lease at a time when the Receiver has made the decision not to accept such Lease but has not taken formal proceedings to reject such Lease and no acceptance of said Lease is undertaken in the subsequent bankruptcy?

This question only hints at, but does not sufficiently state, the issue Economy now raises.

my property for the period November 1 through November 5, 1976, with the understanding that this is in full payment for use and occupancy for the period after October 31, 1976.

App. at 886. By letter dated November 26, 1976, Greene responded to Sable as follows:

Without intending to change *any of the understandings or agreements reached at our meeting of November 16, 1976,* I am taking the liberty of enclosing herewith a revised draft of your letter which I believe will clarify some of the items which I thought to be somewhat ambiguous and will revise some of the language that I thought might be compromising or otherwise misinterpreted.

App. at 888 (emphasis added). In his revised draft, Greene confirmed that the receiver would agree to pay Economy $7,945.70 for rent through October 31, 1976, and $500 for rent from November 1 through November 5, 1976. With regard to the termination of the lease, Greene added that as of November 5, 1976, the "Receiver surrendered the premises to Economy." App. at 889. Allen also responded to Sable's letter, making two minor comments. A pertinent clarification of the agreement was Allen's statement that "Receiver will formally terminate and abandon lease on Nov. 5." App. at 892.

■ Although much of this evidence could be construed to mean that the receiver was surrendering only his own interest, Sable's letter and Allen's and Greene's responses support the district court's finding that the receiver agreed with Allen and Greene that Bollinger's lease with Economy was surrendered as of November 5, 1976. The finding was not clearly erroneous.

### C.

■ Finally, Economy argues that even if there were an attempted surrender of the lease by the receiver, the surrender was not enforceable because the Landlord and Tenant Act of 1951 requires the surrender of leases of more than three years duration to be in writing.[16] We disagree. Section 250.-203's requirement of a signed writing has been held to be applicable only to executory

agreements to surrender. *Kitty Kelly Market St. Philadelphia Corp. v. Barsky,* 188 Pa.Super. 474, 149 A.2d 571, 573 n.* (1959) (affirming 16 Pa.D.&C.2d 293 (1958)). The premises in question having been vacated and the landlord having retaken possession, the statute of frauds provision of the Landlord and Tenant Act did not defeat the validity of the surrender agreement.

### D.

■ Because the lease from Economy to Bollinger had been surrendered, Bollinger's nonpayment of rent did not entitle Economy to distrain on Luria's goods. Under Pennsylvania law this was an improper exercise of dominion over a stranger's personal property; Economy thus is liable to Luria on the theory advanced in Count II of the complaint that the distraint violated state law.

### IV.

■ Having rejected the district court's determination of liability under federal law and upheld its holding under state law, we now turn to the question of damages. We will let stand the award of compensatory damages of $26,858.52 because that award had two independent bases— state and federal—and because we conclude that it was supported by sufficient evidence. Likewise, although an award of punitive damages based solely on the § 1983 count would fall, the punitive damage award here had separate federal and state bases, as indicated in the jury's answers to special interrogatories. There was sufficient evidentiary support for the jury's finding that Economy acted "maliciously, wantonly, or oppressively"; *e.g.,* Economy's written acknowledgment that the lease with Bollinger had terminated, its awareness that the distrained personalty was Luria's, and the involvement of Greene and Allen on both ends of the Economy-Bollinger lease. We will not disturb the award of punitive damages.

### V.

We are left with the appeal concerning the $52,660.00 attorney's fees awarded by

---

**16.** Section 203 of the Act provides:

No lease of any real property made or created for a term of more than three years shall be assigned, granted or surrendered except in writing signed by the party assigning,

granting or surrendering the same or his agent, unless such assigning, granting or surrendering shall result from operation of law. Pa.Stat.Ann. tit. 68, § 250.203.

the district court in the exercise of its discretion under 42 U.S.C. § 1988, which provides:

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

It is clear that, by virtue of our adjudication today, Luria cannot be said to have prevailed in its § 1983 count. Yet Luria defends its entitlement on the basis of a line of cases holding that, even absent judgment for the prevailing party on a § 1983 claim, recovery under § 1988 is permitted if that party successfully asserts a state claim arising out of a common nucleus of operative fact.

The cases relied on by Luria are not persuasive, however, because in each case the successful litigant prevailed on both the federal and pendent claims or the federal claim was not adjudicated. Thus, in *Church of Scientology of California v. Cazares*, 638 F.2d 1272 (5th Cir. 1981), the recipient of the attorney's fees prevailed on both the federal and the pendent claim. Similarly, the claimants in *Gagne v. Maher*, 594 F.2d 336 (2d Cir. 1979), *aff'd*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980) (consent decree); *Lund v. Affleck*, 587 F.2d 75 (1st Cir. 1978); *Kimbrough v. Arkansas Activities Ass'n*, 574 F.2d 423 (8th Cir. 1978); and *Seals v. Quarterly County Court of Madison County, Tennessee*, 562 F.2d 390 (6th Cir. 1977), all prevailed on their pendent claims and, following the teaching that courts should be reluctant to resolve a federal constitutional question if a non-constitutional claim is dispositive, the courts declined to consider the federal constitutional issues on which federal jurisdiction was predicated. In this series of cases the courts drew nourishment from the following passage of the House Report on the Civil Rights Attorney's Fees Awards Act of 1976:

> In some instances, however, the claim with fees may involve a constitutional question which the courts are reluctant to resolve if the non-constitutional claim is dispositive. *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). In such cases, if the claim for which fees may be awarded meets the "substantiality" test, *see Hagans v. Lavine, supra; United Mine Workers v. Gibbs*, 383 U.S.

715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), attorney's fees may be allowed even though the court declines to enter judgment for the plaintiff on that claim, so long as the plaintiff prevails on the non-fee claim arising out of a "common nucleus of operative fact." *United Mine Workers v. Gibbs, supra*, at 725, 86 S.Ct. 1130 [1138].

H.R.Rep.No. 94–1558, 94th Cong., 2d Sess. 4 n.7 (1976) (quoted in *Seals*, 562 F.2d at 393–94).

■ We are not confronted with these circumstances. Here the district court did reach both the federal constitutional question and the related state law question, and here we have concluded that the claimant of the attorney's fees has not prevailed in the § 1983 claim. Thus, the question reduces itself to one of statutory construction: if, as a result of an adjudication, one is the losing and not the prevailing party on a § 1983 claim, may he be entitled nevertheless to attorney's fees on the strength of his success on a related state law claim? We do not think so. "[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The statute plainly limits fee awards to "the prevailing party" "[in] any action or proceeding to enforce a provision of [section] 1983." The losing party is not the prevailing party; what is black cannot be called white.

We find no legislative intent to treat a losing party in a § 1983 action as a "prevailing party" simply because he prevails on a related state claim.

> In cases of statutory construction, this Court's authority is limited. If the statutory language and legislative intent are plain, the judicial inquiry is at an end. Under our jurisprudence, it is presumed that ill-considered or unwise legislation will be corrected through the democratic process; a court is not permitted to distort a statute's meaning in order to make it conform with the Justices' own views of sound social policy. *See TVA v. Hill*, 437 U.S. 153 [98 S.Ct. 2279, 57 L.Ed.2d 117] (1978).

*Industrial Union Dept. v. American Petroleum Inst.*, 448 U.S. 607, 688, 100 S.Ct. 2844,

2887, 65 L.Ed.2d 1010 (1980) (Marshall, J., dissenting).

We note that our conclusion is in accord with a recent Fourth Circuit decision. In *Haywood v. Ball*, 634 F.2d 740 (4th Cir. 1980), an appeal from a district court's denial of attorney's fees to a party who had prevailed on a pendent state negligence claim but lost on his § 1983 claim, the court stated:

> Concededly, the legislative history of the Fees Act supports the award of fees ... where the trial court has declined to pass upon the constitutional claim. H.R. Rep.No. 95–1558, 94th Cong., 2d Sess. 4 n.7 (1976). However, we find nothing in the statute, the legislative history, or decisions on the subject which would require or justify an award of attorney's fees in a case where the plaintiff has lost on the constitutional issue after a plenary trial. Accordingly, the denial of fees in this case was proper.

*Id.* at 743.[17]

Accordingly, the grant of attorney's fees by the district court will be reversed, not on the basis of an abuse of discretion, but solely because under our decision today Luria is the losing and not the prevailing party in the § 1983 claim.[18]

### VI.

The judgment of the district court will be reversed to the extent that it granted compensatory damages, punitive damages, and attorney's fees under the § 1983 claim; it will be affirmed to the extent that compensatory and punitive damages were granted in the state claim.[19] Each side to pay its own costs.

17. It further appears that Pennsylvania follows the "American Rule": "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). *See, e.g.*, 42 Pa. Cons. Stat. Ann. § 2503, which enumerates the classes of parties entitled to counsel fees as part of taxable costs; and 1726(1), which states that attorney's fees are not an item of taxable costs except to the extent authorized by § 2503. Luria has not directed us to any Pennsylvania law permitting recovery of attorney's fees in its state claim and our independent research has disclosed none.

18. That we hold that Luria is not entitled to attorney's fees is not to say that Economy necessarily will be entitled to them. The award of attorney's fees under § 1988 is discretionary

### Statement sur Denial of Panel Rehearing

In their petition for rehearing, appellants contend that the argument which we declined to consider in Part III–A of our opinion was presented to the district court and that this court overlooked or misapprehended the portion of the record reflecting that presentation. Our search of the record indicated that appellants had never argued to the district court that the receiver for Bollinger lacked authority to surrender the Bollinger-Economy lease. The parties now agree that the argument was presented in defendants' brief in support of their motion for new trial or judgment n.o.v. following the damages portion of the bifurcated trial. That brief was not included in the record forwarded to this court.

▉ Nevertheless, although is appears that the argument was presented to the district court, we believe the advancement of a new legal theory at that point in those proceedings was unreasonably late. Nearly two years after the entry of the liability phase opinion—which they contend was based upon an error of law—and after the close of testimony on damages and a determination of an award, appellants finally informed the court of an allegation of error. Thus, without interposing an objection or otherwise giving their adversary or the district court an opportunity to meet or possibly cure the purported error, they had allowed the court to conduct a jury trial on damages that were, in appellants' present view, predicated upon an error of law.

It is the essence of the common law tradition that objections be timely presented at trial, so that (a) an adversary may respond

with the trial court. A district court would no doubt consider that, in view of the facts developed at trial here, Luria's claim, although unsuccessful, was not "frivolous, unreasonable, or groundless" or brought to harass, embarrass, or abuse the defendants so as to warrant an award of fees to the opposing party. *Hughes v. Repko*, 578 F.2d 483, 489 (3d Cir. 1978) (quoting *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978)).

19. Economy states that although the district court had earlier indicated it would grant Economy's motion for judgment n.o.v. as to $2,336.81 interest awarded by the jury, the court inadvertently failed to do so. We agree with Economy that this issue can be resolved by a motion under Fed.R.Civ.P. 60(b).

by testimony or otherwise, and (b) a trial court may make appropriate rulings in the context of a trial setting. To make an objection in a post-trial motion on an issue not preserved at trial by proper objection runs counter to that tradition.

In light of these circumstances, we continue to decline to consider appellants' new theory and accordingly we deny appellants' petition for panel rehearing.

We also deny appellee's petition for panel rehearing on the question of attorney's fees under Pennsylvania law.